*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

MARK ANTHONY JAKEE,

       Defendant-Appellant.

UNPUBLISHED
September 28, 2023

No. 359373
Grand Traverse Circuit Court
LC No. 2021-013830-FC

Before: GLEICHER, C.J., and JANSEN and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of seven counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (victim under 13 years old, defendant older than 17 years old); and one count of accosting a child for immoral purposes, MCL 750.145a. Defendant was sentenced to 35 to 60 years' imprisonment for each of his CSC-I convictions and six months' imprisonment for the accosting a minor conviction. We affirm.

## I. FACTUAL BACKGROUND

Over more than 30 years, defendant sexually assaulted or attempted to sexually assault five boys under the age of 13, and one under the age of 16. Defendant began his predatory behavior in the 1980s, when he instructed DJM, a boy between 8 and 10 years old to whom he was related by marriage, to pull down his pants. When DJM did so, defendant touched his buttocks. Later, when defendant was 19 years old, he moved to Alaska with family members. Defendant befriended a boy of about 11 or 12 years of age, JLC, and bought him baseball cards. Defendant also offered to babysit JLC, which his parents allowed. While babysitting JLC, defendant performed fellatio on JLC a number of times, and attempted to penetrate JLC's anus with his penis on at least one occasion. The abuse stopped either when JLC moved to Alabama or defendant moved back to Michigan. Defendant was not charged with any crimes related to the above incidents, but DJM and JLC testified at trial over defendant's objection.

When he returned to Michigan, defendant focused his predatory behavior on a young family member, JM, and a group of three brothers who lived nearby, JGP, NP, and SP. JM could only recall one specific instance when defendant tried to penetrate JM's anus with defendant's

-1-

penis, but he also recalled being asked to pull down his pants for defendant. JM also remembered waking up in defendant's home with his pants undone.

Defendant befriended the mother of the three neighbor children and offered to babysit them. NP, who had some memory issues, recalled one night when he stayed at defendant's home and woke up with defendant's penis inside of his anus. NP thought it was a dream, but the sexual assaults continued. NP described a specific instance of penile-oral penetration when NP was helping defendant set up an aquarium.[1] JGP testified about a lengthy period of abuse, beginning when he was about 11 or 12 years old. It began with defendant performing oral sex on JGP, then progressed into penile-oral penetration both ways, and penile-anal penetration both ways. JGP testified that the sexual assaults occurred at least weekly. He specifically remembered an instance where defendant picked him up while he walked to the bus stop, drove him to defendant's house, assaulted him, and then dropped him off at school. During that period, JGP believed that he was being sexually assaulted about two or three times per week. JGP also remembered a trip to Alabama to visit JLC's family, during which he was sexually assaulted by defendant in a motel room and in JLC's home.

SP recalled a similarly lengthy history of abuse, which began when he was only seven or eight years old. It began with SP waking up one night with defendant's mouth on his penis. SP tried to fight defendant off but was unable. This happened about 10 times before SP stopped seeing defendant regularly. However, when SP entered ninth grade, defendant began to assault him again. SP testified the abuse continued from ninth to eleventh grade, and escalated to exchanges of penile-oral penetration, defendant penetrating SP's anus, and one instance of SP penetrating defendant's anus.

In about 2004, defendant befriended another woman in his neighborhood. She had two children, one of whom was JF. JF testified that he was about eight years old when defendant began sexually assaulting him. JF stated defendant told him it was normal to perform oral sex on someone you loved, and then asked JF if he loved defendant. JF recalled about 10 instances of defendant and JF performing fellatio on one another. JF's mother eventually found out JF was being abused and went to the police, but for reasons unclear from the record, no charges were ever brought against defendant.

In 2019, defendant began spending time with JM's stepson, DT, who was about 14 years old. Defendant would allow DT to come over to watch television shows and smoke marijuana. On one occasion, as DT was preparing to leave defendant's house, defendant asked if he wanted one more hit of marijuana. DT said he did, but defendant said DT would have to show defendant his buttocks to get it. DT thought defendant was joking at first, lifted his shirt up a bit in a joking manner, but then left when he realized defendant was serious. DT told his parents about the incident more than a year later. Upon hearing it, JM opened up about his abuse. JM and DT's family decided to contact the police, and JM directed officers to other young boys who might have been abused many years before. After he was arrested, police found a hard drive in a safe in defendant's bedroom containing about 20,000 images of child sexually abusive material.

---

[1] NP did not tell anyone about the abuse until 1999, after he attempted to take his own life.

Defendant's ex-boyfriend also came forward to testify about a flash drive he once found in defendant's backpack that contained similar materials.

During trial, before his testimony, JF was diagnosed with COVID-19. The prosecution asserted this made JF unavailable under MRE 804(a)(4), which permitted the trial court to allow JF's testimony from the preliminary examination to be read into the record. Defendant objected, citing concerns related to the Confrontation Clause. The trial court agreed with the prosecution, but offered defendant the option of either using the preliminary examination testimony or having JF appear live via Zoom. Defense counsel chose the transcript.

Defendant called a number of witnesses on his behalf, many of whom were family members. These witnesses testified that defendant did not have young boys staying the night at his home very often, if at all. Defendant's niece and sister, who lived with defendant during many of the instances of alleged abuse, testified the walls in the house were thin, so they would have heard if defendant was sexually assaulting young boys. Defendant testified he did not commit the crimes, and instead alleged a conspiracy against him formulated by JM. Defendant asserted JM was upset because defendant had disallowed DT, JM's stepson, from coming over to defendant's house. The jury deliberated only two hours before convicting defendant of all charges. Defendant was sentenced as already noted. The minimum sentence of 35 years' imprisonment was an upward departure from defendant's guidelines minimum sentence range. This appeal followed.

## II. ANALYSIS

### A. UNCHARGED INSTANCES OF SEXUAL ASSAULT

Defendant first argues that the trial court abused its discretion and violated his due-process rights by allowing the prosecution to admit testimony from DJM and JLC related to alleged instances of sexual assault for which defendant was never charged or convicted. We disagree.

Defendant raises both evidentiary and constitutional challenges to the admission of the testimony of JLC and DJM. "To preserve an evidentiary issue for review, a party opposing the admission of evidence must object at trial and specify the same ground for objection that it asserts on appeal." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). "An objection based on one ground is usually considered insufficient to preserve an appellate attack based on a different ground." *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004). To preserve a constitutional claim, such as one involving the right to due process, a defendant must "raise an objection on the ground" also raised on appeal. *People v Brown*, 326 Mich App 185, 191-192; 926 NW2d 879 (2019). Before trial, defendant moved the trial court to preclude the evidence on the basis of MCL 768.27a(1), MRE 404(b), and MRE 403. He did not raise any constitutional challenges to the proposed evidence. Specifically, defendant did not contend that the admission of the evidence violated his due-process rights or that the statute permitting admission of the evidence was unconstitutional. Consequently, defendant's evidentiary arguments are preserved, but his constitutional claims are not. *Thorpe*, 504 Mich at 252; *Kimble*, 470 Mich at 309; *Brown*, 326 Mich App at 191-192.

As to the preserved evidentiary issues, this Court "reviews for an abuse of discretion a circuit court's decision to admit or exclude evidence." *People v Kowalski*, 492 Mich 106, 119;

821 NW2d 14 (2012). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes." *Thorpe*, 504 Mich at 251-252 (quotation marks and citations omitted). When preserved, "[a]n alleged violation of a criminal defendant's due-process rights presents a constitutional question and is reviewed de novo." *People v Horton*, 341 Mich App 397, 401; 989 NW2d 885 (2022). De novo review "means that we review the issues independently, with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019).

As to the unpreserved constitutional issues, we review such claims "for plain error affecting substantial rights." *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021) (quotation marks and citation omitted). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To show that a defendant's substantial rights were affected, there must be "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018) (citation omitted).

Defendant argues that JLC's and DJM's testimony should have been excluded under MRE 403, and contends that the trial court's failure to do so violated his due-process rights. "The United States Constitution and the Michigan Constitution each guarantee that a criminal defendant receives due process of law." *Horton*, 341 Mich App at 401, citing US Const, Am XIV; Const 1963, art 1, § 17. "Implicit in this guarantee is that each criminal defendant enjoys the right to a fair trial . . . ." *Horton*, 341 Mich App at 401. " '[A]n important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence . . . .' " *People v Hana*, 447 Mich 325, 350; 524 NW2d 682 (1994), amended 447 Mich 1203 (1994), quoting *Zafiro v United States*, 506 US 534, 540; 113 S Ct 933; 122 L Ed 2d 317 (1993). However, even though defendant is entitled to a *fair* trial, he is not entitled to a *perfect* trial, as "there are no perfect trials." *People v Miller*, 482 Mich 540, 559; 759 NW2d 850 (2008) (quotation marks and citation omitted).

Defendant was not charged with crimes related to his sexual assaults of DJM and JLC, rendering them "other-acts" evidence under MCL 768.27a(1). DJM testified that the abuse occurred when defendant was between 15 and 18 years old. DJM described the assault by defendant as involving a command by defendant for DJM to drop his pants and bend over, after which defendant fondled DJM's buttocks. DJM testified that no anal penetration occurred and that defendant only touched him with his hands. DJM stated that there were no other instances of abuse perpetrated by defendant.

JLC testified that he was sexually assaulted in Alaska, where defendant moved when he was 19 years old. JLC testified about a series of assaults fitting defendant's scheme of using bribery, guilt, and false expressions of love to lure children into sexually abusive situations and then shame them into silence. JLC stated defendant would buy him things, such as baseball cards, both to become close to him and to ensure that he did not tell anyone about the abuse. Like many of defendant's other victims, defendant babysat for JLC. JLC remembered about 10 instances of

defendant performing oral sex on him. Further, there was one instance when defendant attempted to anally penetrate JLC with his penis.

The testimony was admitted by the trial court according to MCL 768.27a(1), which states that "in a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant." A "listed offense" includes a charge of CSC-I. MCL 768.27a(2)(a); MCL 28.722(i); MCL 28.722(v)(*iv*). Defendant does not disagree the evidence was admissible under MCL 768.27a(1). Instead, defendant argues the evidence should have been excluded under MRE 403.

"[E]vidence admissible pursuant to MCL 768.27a may nonetheless be excluded under MRE 403 if 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *People v Watkins*, 491 Mich 450, 481; 818 NW2d 296 (2012), quoting MRE 403. "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Gipson*, 287 Mich App 261, 263; 787 NW2d 126 (2010), quoting *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). Such concerns arise where "the tendency of the proposed evidence [is] to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Cameron*, 291 Mich App 599, 611; 806 NW2d 371 (2011) (quotation marks and citation omitted). When determining whether evidence should be excluded, trial courts should consider the following factors:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Watkins*, 491 Mich at 487-488.]

Here, because the evidence is admissible under MCL 768.27a(1), it is permitted to be introduced to prove defendant had the propensity to commit the charged crimes. The testimony showed that defendant began his assaults of young boys well before he began assaulting the victims in the present case. The evidence also showed that defendant developed a system to abuse young boys. When he first abused DJM, he merely instructed DJM to remove his pants and then fondled him. Importantly, DJM testified he decided not to tell anyone about the abuse solely because he was raised to keep things to himself. DJM did not cite shame, fear, or some form of bribery. Thus, when viewed on its own, DJM's testimony does appear too dissimilar to be relevant to the charged crimes, which were far more extreme than the crime committed against DJM. However, when taken together with JLC's testimony, it becomes clear that defendant engaged in an escalating pattern of abuse that started with DJM. Not long after abusing DJM, defendant began using bribery and shame in order to accomplish his goals. Defendant bought JLC things he enjoyed, such as baseball cards, which persuaded JLC to spend more time with him, thus giving him more of an opportunity to abuse JLC. Defendant used guilt and bribery to keep JLC quiet. Pertinently, JLC testified defendant was apologetic after the first instance of abuse, asked him not to tell anyone,

and bought him more baseball cards. Defendant then continued the abuse, which progressed into an instance where he attempted to penetrate JLC's anus with his penis. This progression toward more severe abuse would continue to escalate with later victims. When asked why he did not come forward, JLC cited, among the general shame and fear, that defendant told JLC he loved him, so JLC thought he was the only one being abused. JLC also testified that JGP came to Alabama with defendant, which corroborated JGP's testimony about being sexually assaulted by defendant.

The probative value of DJM's and JLC's testimony is illuminated when one considers it in the context of the other boys who defendant sexually assaulted. Beginning with DJM, defendant created situations where he could be alone with and groom the young boys. With JLC, he began buying them gifts and taking them to do fun things so that they would want to spend time with him. Defendant would also ensure his presence in the children's lives was beneficial to their parents, growing close to them as well, and offering to babysit. After developing a relationship with the young boys, defendant would then assert his influence and demand sexual favors. Defendant's sexual assaults would progress to anal penetration as time progressed. The testimony was highly probative because it showed how defendant began developing a system of abuse, which he used repeatedly over the course of 30 years.

Having established the high probative value of the evidence, the next question is whether this value was outweighed by the danger of unfair prejudice. MRE 403; *Cameron*, 291 Mich App at 611. In support of his claim that the evidence should have been excluded under MRE 403, defendant cites inflamed passions, anger, and shock from the jurors on hearing of defendant's sexual assaults of DJM and JLC. This argument is unpersuasive. The anger and shock of the jurors was undoubtedly going to be a concern to the defense solely on the basis of the actual charges. It is unlikely that adding testimony from two more victims, whose alleged instances of abuse occurred earlier and more infrequently than the complainants' sexual assaults, made a difference to the jury. This was recognized by the trial court, and we agree completely. Simply put, given the nature of the crimes with which defendant was charged, a concern about inflamed passions and anger from the jury about the testimony of DJM and JLC was insignificant. The danger of the unfair prejudice arising from the evidence certainly did not substantially outweigh its probative value. MRE 403.

Defendant also suggests that the trial court abused its discretion by failing to explicitly weigh the *Watkins* factors before deciding to admit the testimony. The record shows otherwise. The trial court specifically addressed defendant's allegations of unfair prejudice, reasoned that they lacked merit given the facts of the case, and then stated, "I don't think that the probative value is substantially outweighed by the dangers of cumulative testimony or waste of time. So I'm going to allow it under 403 also." Consequently, the record shows the trial court properly considered the issue and decided it within the range of reasonable outcomes. MRE 403; *Watkins*, 491 Mich at 489. Additionally, even if defendant was correct, and the trial court failed to weigh the *Watkins* factors on the record, this Court has opined that "There is no indication from *Watkins* that these factors must be discussed on the record." *People v Hoskins*, 342 Mich App 194, 203; 993 NW2d 48 (2022). Although they are no doubt important for determining whether other-acts evidence should be admitted, "they do not supersede the standard plainly provided in MRE 403 itself." *Id*. We are satisfied that the trial court properly applied MRE 403 to the other-acts evidence presented here. Thus, the trial court did not abuse its discretion when it declined to exclude the evidence. *Kowalski*, 492 Mich at 119.

Consequently, defendant's due-process argument, in which he contends that his right to a fair trial was violated solely because the evidence should have been excluded under MRE 403, also lacks merit. *Horton*, 341 Mich App at 401; US Const, Am XIV; Const 1963, art 1, § 17. Because the challenged evidence was relevant, competent, and admissible, defendant's due-process rights were not violated by the trial court's refusal to exclude the evidence. *Hana*, 447 Mich at 350, quoting *Zafiro*, 506 US at 540. Defendant alternatively contends that the application of MCL 768.27a(1) led to the unconstitutional deprivation of his due-process rights. He argues that his constitutional rights were violated because "the statute itself is based on the presumption that prior allegations prove he was—and therefore is—guilty." This Court recently addressed this issue in *People v Muniz*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 355977); slip op at 12. There, the defendant argued

> that allowing the testimony of the complainant to include his alleged past acts of sexual abuse against [the victim] violated his due-process right to a fair trial because the "other acts" testimony served as evidence of [the] defendant's propensity to commit the crime charged, and allowed the jury to convict him on that basis.

This Court noted that the statute allowed a jury to consider the evidence as relevant to whether the defendant had a propensity to commit CSC-I, but it did not "lower the quantum of proof or probative value of the evidence that the prosecution must present for conviction of the crime charged." *Id*. In other words, the admission of evidence of prior acts of sexual assault was not "fundamentally unfair," and thus, not a due-process violation. *Id*. We are bound by the decision in *Muniz* under the rule of stare decisis, MCR 7.215(C)(2), and moreover, we agree with it. Accordingly, defendant's argument must fail.

## B. CONFRONTATION

Defendant next contends that his rights under the Confrontation Clause were violated by the trial court's decision to allow JF's preliminary examination testimony to be read into the record. We disagree.

"Whether a defendant's Sixth Amendment right of confrontation has been violated is a question of constitutional law that this Court reviews de novo." *People v Bruner*, 501 Mich 220, 226; 912 NW2d 514 (2018).

"A defendant has the right to be confronted with the witnesses against him or her." *People v Yost*, 278 Mich App 341, 369-370; 749 NW2d 753 (2008), citing US Const. Am VI; Const 1963, art 1, § 20; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). Our Supreme Court has held that "the constitutional right to confront one's accusers would not be violated by the use of preliminary examination testimony as substantive evidence at trial only if the prosecution had exercised both due diligence to produce the absent witness and that the testimony bore satisfactory indicia of reliability." *People v Bean*, 457 Mich 677, 682-683; 580 NW2d 390 (1998) (footnotes omitted). "Former testimony is admissible at trial under MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony." *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). " 'Unavailability as a witness' includes situations in which the

declarant . . . is unable to be present or testify at the hearing because of death or then existing physical or mental illness or infirmity[.]" MRE 804(a)(4).

The prosecution informed the trial court on the first day of trial that JF had been diagnosed with COVID-19, and argued that this was a physical illness under MRE 804(a)(4), which rendered JF unavailable to testify. The trial court agreed. On appeal, defendant contends that JF was not truly unavailable. In support of his argument, defendant relies on MRE 804(a)(2) and (5). Under those subrules, a witness can be considered unavailable if they "persist[] in refusing to testify," MRE 804(a)(2), or are "absent from the hearing and the proponent of a statement has been unable to procure [their] attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown," MRE 804(a)(5). Obviously, this argument misses the mark because the prosecution never alleged, and the trial court never found, that JF was unwilling to testify or that the prosecution was unable to get JF to come to trial after exercising due diligence. Instead, JF was determined to be unavailable because he was physically ill with COVID-19. MRE 804(a)(4).

Defendant only makes one argument related to the determination of unavailability on the basis of MRE 804(a)(4); specifically, he claims that JF was not unavailable because he could have testified via Zoom. This argument presumes that having JF testify via Zoom would have made him "available" as that term is contemplated when discussing the Confrontation Clause. However, as explained by our Supreme Court in *People v Jemison*, 505 Mich 352, 356; 952 NW2d 394 (2020), "*Crawford* requires face-to-face cross-examination for testimonial evidence unless a witness is unavailable and the defendant had a prior opportunity for cross-examination." Live video testimony, the *Jemison* Court reasoned, was not enough to effect compliance with this constitutional mandate. *Id*. In so holding, the Court determined that testimony via Zoom was not the "face-to-face" confrontation imagined by the United States and Michigan Constitutions. *Id*. at 366. The purpose of the "unavailability" requirement is that, if a witness is available, then they must be brought to the courtroom to testify. If live, interactive video testimony rendered a person "available," then *Jemison* would be rendered entirely redundant because the Confrontation Clause would not have even been implicated. In sum, then, JF's willingness and availability to testify via Zoom did not impact the trial court's determination that JF was "unavailable" under MRE 804(a)(4) because of what was then a then life-threatening and highly communicable physical illness plaguing the planet.

Lastly, defendant contends that his constitutional right to confrontation was violated because his counsel did not cross-examine JF to the extent he would have at trial. But "[t]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v Owens*, 484 US 554, 559; 108 S Ct 838; 98 L Ed 2d 951 (1988) (quotation marks and citation omitted). Defendant does not argue that his opportunity to cross-examine JF at the preliminary examination was infringed upon by the prosecution. Instead, his argument is premised on defense counsel's strategy to save the more aggressive and probing questioning for trial, which has everything to do with how defendant conducted cross-examination, and nothing to do with the opportunity provided to him. In short, because defendant was provided an opportunity to cross-examine JF during preliminary examination, regardless of how effective it was, the use of the testimony was permitted under the Confrontation Clause given JF's unavailability. *Crawford*, 541 US at 68; *Owens*, 484 US at 559; *Bean*, 457 Mich at 682-683. Thus, we conclude that defendant's argument on this issue lacks merit.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Related to his Confrontation Clause argument, defendant also argues that defense counsel was ineffective because he chose to have JF's preliminary examination testimony read into the record instead of requiring him to appear via Zoom. We disagree.

To preserve a claim of ineffective assistance of counsel, a defendant must "move the trial court for a new trial or a *Ginther*[2] hearing," *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015), or "fil[e] in this Court a motion for remand to the trial court for a *Ginther* hearing," *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020) (citation omitted). It is undisputed that defendant did not do any of these things. Therefore, this issue is unpreserved, and our review "is limited to mistakes apparent on the record." *Johnson*, 315 Mich App at 174.

The United States Supreme Court has held that "to receive a new trial on the basis of ineffective assistance of counsel, a defendant must establish that 'counsel's representation fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v Vaughn*, 491 Mich 642, 669; 821 NW2d 288 (2012), quoting *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *Jackson*, 313 Mich App at 431, quoting *Strickland*, 466 US at 690. "Next, the defendant must show that trial counsel's deficient performance prejudiced his defense— in other words, that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Jackson*, 313 Mich App at 431, quoting *Vaughn*, 491 Mich at 669.

As discussed above, the trial court determined that JF was unavailable to testify under MRE 804(a)(4) because he contracted COVID-19. It therefore permitted JF's preliminary examination to be read into the record. Defense counsel sought a dismissal of the charge related to JF, explaining he did not cross-examine witnesses in the same manner at preliminary examination as he would at trial. The trial court offered to allow defendant to waive his right under the Confrontation Clause and have JF testify via Zoom. Alternatively, the trial court stated that it would move forward with trial using the preliminary examination testimony. Defense counsel agreed that he would prefer the preliminary examination transcript be read into the record. Defendant was convicted of CSC-I in relation to the alleged sexual abuse of JF.

Defendant now contends that choosing to use JF's preliminary examination testimony was an objectively unreasonable trial strategy because defense counsel specifically stated he had more questions to ask JF that were not asked during preliminary examination. "This Court will not substitute its judgment for that of counsel on matters of trial strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *People v Loew*, 340 Mich App 100, 120; 985 NW2d 255 (2022). "If counsel's strategy is reasonable, then his or her performance was not

---

[2] *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).

deficient." *People v Isrow*, 339 Mich App 522, 532; 984 NW2d 528 (2021) (quotation marks and citation omitted).

Defendant has failed to overcome the presumption that defense counsel's decision to move forward with JF's preliminary examination was the result of sound trial strategy. *Id*. Indeed, it is not difficult to see the strategic reasoning behind defense counsel's decision in this matter. It seems an obvious possibility that JF would have been emotional in his testimony, considering he would have had to talk about his abuse in front of a group of strangers. Such a display of emotion could have in turn triggered the emotions of the jurors. By allowing JF to appear in front of the jury and potentially cry or show anger, defense counsel was risking further inflammation of the jury's anger and passion. Conversely, when a neutral third-party reads former testimony into the record, there is no chance that outbursts of emotion could affect the jurors' consideration of the case. Additionally, intense or aggressive questioning of a victim could be seen by the jury as attacking JF, which could engender sympathy for him among the jurors.

It is undoubtedly true that this choice had its risks, but either choice would have been risky here. That does not render defense counsel's decision to allow the preliminary examination testimony to be read into the record unreasonable. Defense counsel admitted he wanted to ask more questions of JF, though he made that specific argument before the trial court ruled on admitting the preliminary examination testimony after defendant's objection to it. But after weighing whether he either wanted to ask more questions or shield the jury from potential emotional and damaging testimony from JF, defense counsel chose the preliminary examination testimony. Given the risks involved with either choice, there is nothing apparent on the record to suggest this decision by defense counsel was an objectively unreasonable trial strategy. *Isrow*, 339 Mich App at 532.

Defendant next points out that defense counsel allowed JF's mother and stepfather to testify via Zoom, and argues that there was no strategic reason to prevent JF from testifying via Zoom as well. This decision is easily explained on the basis of the strategy discussed above. JF's mother and stepfather, while potentially emotional about the abuse of their child, were not themselves victims of defendant's sexual abuse. They were not there when JF suffered the abuse, and only heard about it afterward. Allowing them to testify live via video was far less risky, in terms of potentially exposing the jury to emotionally charged or inflammatory testimony, than asking JF to do so. When the risk of an individual's testimony being overly emotional or damaging to the defense was lessened, defense counsel chose to take the opportunity to more significantly cross-examine those witnesses. However, when it came to a victim, defense counsel clearly determined that that the risk was not worth any possible reward, and therefore decided to allow JF's preliminary examination testimony to be read into the record. This choice supports the conclusion that defense counsel's trial strategy was rational and sound, and was therefore not constitutionally deficient. See *Isrow*, 339 Mich App at 532. In other words, defendant has failed to fulfill the first prong of *Strickland* by proving defense counsel's performance fell below an objective standard of reasonableness.

Even if we were to agree that defense counsel made the wrong choice, defendant's argument would still fail under the second prong of *Strickland*. As explained above, to succeed in showing ineffective assistance of counsel, defendant must also be able to show that he was prejudiced by his counsel's deficient performance. *Jackson*, 313 Mich App at 431. Defendant's

-10-

argument is premised on the fact that defense counsel would have asked more questions during cross-examination at trial than he did at the preliminary examination. However, defendant has not referenced any record evidence regarding what those questions would have been, how they would have affected the jury's consideration of the case, or how he believed JF would have answered them. Absent such evidence, there is no ground for us to determine the outcome of trial would have changed had defense counsel opted to have JF testify via Zoom. His failure to present evidence to establish the factual predicate for his claim, or to show that he was prejudiced by defense counsel's performance, is fatal to his claim. In other words, defense counsel may have elected the trial strategy of allowing the jury to only consider the limited testimony offered by the witness at the preliminary examination, rather than risk the prospect of live testimony that could be potentially more damaging to the defense. As the adage goes, "better the devil you know than the devil you don't."

## D. SENTENCING

Lastly, defendant contends that the trial court's sentences for defendant's CSC-I convictions should be vacated because the 35-year minimum was disproportionate. We disagree.

"We review for an abuse of discretion whether a sentence is proportionate to the seriousness of the offense." *People v Armisted*, 295 Mich App 32, 51; 811 NW2d 47 (2011). A "trial court abuse[s] its discretion by violating the principle of proportionality . . . , which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017) (citation and quotation marks omitted).

This Court concisely restated the law regarding proportionality and reasonableness of departure sentences in *People v Lampe*, 327 Mich App 104, 125-127; 933 NW2d 314 (2019):

> This Court reviews an out-of-guidelines sentence for reasonableness. *People v Lockridge*, 498 Mich 358, 365; 870 NW2d 502 (2015). "[T]he standard of review to be applied by appellate courts reviewing a sentence for reasonableness on appeal is abuse of discretion." [] *Steanhouse*, 500 Mich [at] 471 []; see also *People v Dixon-Bey*, 321 Mich App 490, 520; 909 NW2d 458 (2017). A sentence is unreasonable—and therefore an abuse of discretion—if the trial court failed to adhere to the principle of proportionality in imposing its sentence on a defendant. *Steanhouse*, 500 Mich at 477, citing *People v Milbourn*, 435 Mich 630; 461 NW2d 1 (1990). That is, sentences imposed by a trial court must "be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Milbourn*, 435 Mich at 636. The trial court's fact-finding at sentencing is reviewed for clear error. See *People v Garay*, 320 Mich App 29, 43; 903 NW2d 883 (2017)(citation omitted)[, rev'd in part on other grounds 506 Mich 936 (2020)].

> "[A] sentence is reasonable under *Lockridge* if it adheres to the principle of proportionality set forth in *Milbourn*." [] *Walden*, 319 Mich App [at] 351 []. *Milbourn*'s "principle of proportionality . . . requires the sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Id*. at 352 (quotation marks and citation omitted).

An out-of-guidelines sentence "may be imposed when the trial court determines that 'the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime.' " *People v Steanhouse (On Remand)*, 322 Mich App 233, 238; 911 NW2d 253 (2017)[, vacated on other grounds 504 Mich 969 (2019)].

> Factors that may be considered by a trial court under the proportionality standard include, but are not limited to:
>
> > (1) the seriousness of the offense; (2) factors that were inadequately considered by the guidelines; and (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*Walden*, 319 Mich App at 352-253 (citation omitted).]

The legislative guidelines remain a "useful tool" that must be taken into account when sentencing a defendant, and "a trial court must justify the [out-of-guidelines] sentence imposed in order to facilitate appellate review, which includes an explanation of why the sentence imposed is more proportionate to the offense and the offender than a different sentence would have been." *Dixon-Bey*, 321 Mich App at 524-525 (quotation marks and citation omitted).

During sentencing, the trial court stated that the guidelines minimum sentence range was 120 to 300 months for Counts I through VI. The presentence investigation report provided to us establishes a guidelines minimum sentence range of 120 to 210 months, which relates to Count VII. The trial court departed from the guidelines by sentencing defendant to a minimum of 35 years' (or 420 months') imprisonment.

The trial court provided the following reasoning regarding why it felt the departure sentence was proportional and proper:

Time and place for a sentencing. This qualifies as the most horrendous sex offense I've seen, in almost 30 years doing this—29 years now. And unfortunately there are a lot of sex offenses we see. But this involved—and there are most—many of them are kind of reflected here in the—to the counts that have been made.

> There's several counts of CSC first with a person under 13. And then a very recent soliciting a child for—accosting a child for immoral purposes—which—which the defendant was unsuccessful, but clearly had—had sexual penetration in mind. What he would do is—throughout these—all these affairs is, he would befriend a family—one example was a single mother with little kids, and he would offer to help her in a way, by being kind of, like, a father figure; and make friends with the family, and try to ingratiate himself, and then start to make friends with

the little boys involved. These were children, most of them—I mean, many of them weren't even in their teens when this started—most of them, actually.

And he would then spend time with them; and, at some point, get them into a spot where he could propose let's have some fun, and start to engage in sexual contact with them of various kinds—up to and including, in most cases, anal penetration. So this went on for a—decades. And so that does—and each victim was—was molested numerous—many times, by and large. So you have many, many victims, and many incidents with—with each victim. And that's the basic pattern we had here.

There are seven counts, and there was at least one that was out of state, so couldn't have been charged, but these—and—and another—you know, was admitted under 404(b). But there were—the guidelines account for a couple of other incidents, a couple other victims—maybe—couple other incidents. Each victim—most of the victims had many, many incidences of this; and there were quite a few victims, as we know—much more than are considered in the guidelines that we are using—either the old ones or the new ones.

Under the circumstances—now, [defendant] says he had a—was a productive citizen. And he didn't really have a criminal record of any significance. But this is a horrendous set of crimes. The course of conduct—even a single event, where—you know, a terrible, terrible thing and he thought better of it.

This is something he did over and over again. It was the centerpiece of much of his life, and his life planning, his life activities, and—so pretty—just horrendous all the way across. So I'm—the guidelines—most of these are under the old guidelines system—which has been scored as 120 months to 300 months. Well, 300 months is let me do the math here.

Twenty-five years is the top of the guidelines for these offenses. On counts—and that's on Counts I through V—I through VI, the top of the guidelines is 25 years. Count VII, top of the guidelines is 210 months, but it was similar-type behavior. And Count VIII, was the accosting, which for—at which the defendant was unsuccessful.

So it seems to me that all Counts, I through VII, should be sentenced about—sentenced the same. And for each of the Counts, I through VII, I'm going to sentence the defendant to the Department of Corrections for no less than 35 years, no more than 60 years. That is a departure. The top of the guidelines is 25 years, but these guidelines do not begin to consider the many offenses for each victim, and do not consider there are many, many victims far more than the guidelines consider. So I think a departure is warranted and—and appropriate.

Bear in mind that had this been committed under modern law, there would be—a single incident could produce a 25-year mandatory minimum. A single incident with one victim. And that's probably a little harsh. And I have to say, I've

seen some injustices out of that mandatory minimum. But that tells you what—what—what society thinks of this.

And here you had many, many incidents with respect to each victim, and many, many victims. So I think it's a substantial and compelling reason to depart. And so, as I say, the Department of Corrections, 35 years to 60 years. And I see no reason to distinguish between Count VII and the others.

Defendant argues that this explanation was insufficient to warrant the departure sentences. Defendant focuses on the trial court's reference to there being many victims of defendant's abuse. Defendant asserts this was an improper consideration because defendant was convicted of offenses related to his victims and sentenced accordingly. In other words, defendant argues that the trial court relied on a factor already adequately considered by the guidelines.

Defendant misses the point of the trial court's reasoning. Defendant claims he was charged with crimes related to all his victims, but that is categorically untrue. Indeed, defendant acknowledged it was untrue by arguing that DJM's and JLC's other-acts testimony should not have been admitted. Thus, there were at least two victims regarding which defendant was not tried and convicted. Moreover, although DJM only testified about one incident, JLC recalled a number of individual instances of abuse, each of which would be a separate charge if they occurred in Michigan instead of Alaska. Defendant was not tried on or convicted of any crimes with respect to these incidents.

Additionally, while there were a significant number of victims, a fact on which the trial court commented, the trial court also referenced the number of incidents with each of those victims. Although JM and NP struggled to recall specific events, their testimony implied that the abuse was regular. JF, on the other hand, testified there were about 10 times when he and defendant would exchange penile-oral penetration. Defendant was only charged with, and convicted of, one count of oral-penile penetration with respect to JF. Considering that JF stated that defendant's penis penetrated JF's mouth and JF's penis penetrated defendant's mouth during each incident, this left a potential total of 19 uncharged counts of CSC-I.

The evidence was even more extreme with respect to JGP and SP. Defendant was only charged with, and convicted of, one count of oral-penile penetration with respect to JGP. According to JGP, the first specific incident he could recall was defendant performing fellatio on him when he was 11 or 12 years old. However, he stated he remembered other incidents of oral-penile penetration before then, and attested that the abuse continued afterward. For example, on a trip to Alabama with defendant, JGP recalled at least five incidents that could have led to CSC-I charges (penile-oral penetration both ways in the motel, penile-anal penetration both ways in the motel, and penile-oral penetration one way at JLC's house). When JGP was walking to the bus stop, he said defendant would pick him up and sexually assault him about two-to-three times per *week*. Needless to say, there were countless sexual assaults committed with respect to JGP alone that were uncharged and of which defendant was not convicted.

The same is true of SP, whose abuse at defendant's hands began when SP was only seven or eight years old. Defendant was charged with, and convicted of, only two counts of oral-penile penetration with respect to SP. SP remembered more than 10 instances of penile-oral penetration

-14-

when he was very young. While there was a break in the abuse when SP stopped seeing defendant regularly, the abuse picked back up when SP was in ninth grade. Although SP may no longer have been under 13 years old, he was still a child. SP stated the abuse continued from then until he was in eleventh grade, which was about two years later. SP testified there were many instances of penile-oral penetrations both ways, and defendant penetrating SP's anus with defendant's penis. There was one occasion when SP penetrated defendant's anus with his penis. Defendant was not charged with any penile-anal penetrations with respect to SP, and, as noted, only two counts of oral-penile penetrations.

Simply put, there were potentially hundreds of charges of CSC that could have been brought against defendant, but were not. There were at least two additional victims regarding which no charges were brought. As explained by the trial court, the sentencing guidelines simply could not address the sheer volume of the sexual assaults committed by defendant. The trial court believed a proportionate sentence with respect to defendant and all of those crimes was above the 300-month sentence at the top of the guidelines range. Given the circumstances surrounding the offender and the offenses, including the shocking number of sexual assaults committed by defendant against defenseless young boys, a departure sentence of 35 to 60 years' imprisonment was reasonable and proportionate. *Lampe*, 327 Mich App at 125-127. Consequently, the trial court did not abuse its discretion when issuing the sentences. *Steanhouse*, 500 Mich at 459-460.

## III. CONCLUSION

Defendant has failed to show entitlement to relief. Accordingly, we affirm defendant's convictions and sentences.

/s/ Elizabeth L. Gleicher
/s/ Kathleen Jansen
/s/ Michelle M. Rick